Filed 3/30/26  P. v. Martin CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D086603, D086604 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. RIF1802917) |
| DEION ELIJAH MARTIN, | |
| Defendant and Appellant. | |


CONSOLIDATED APPEALS from a judgment and postjudgment order of the Superior Court of Riverside County, Samuel Diaz, Jr., and Joshlyn Pulliam, Judges.  Dismissed in part and affirmed in part.

Jean Matulis, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina and Alan L. Amann, Deputy Attorneys General, for Plaintiff and Respondent.

# I. INTRODUCTION

Defendant Deion Elijah Martin was charged with two counts of attempted murder (Pen. Code,[1] §§ 664, 187, subd. (a)) and one count of active participation in a criminal street gang (§ 186.22, subd. (a)). The attempted murder counts carried gang (§ 186.22, subd. (b)) and firearm (§ 12202.53, subds. (d), (e)) enhancement allegations. The prosecution introduced extensive evidence at trial about gangs. The jury found defendant guilty on one count of attempted murder but found him not guilty on all other counts and made not true findings on the gang and firearm enhancement allegations.

Defendant appeals the judgment, arguing the trial court erred under Evidence Code sections 352 and 352.2 by admitting unduly prejudicial excerpts from a gang rap video produced by defendant's music label and in which defendant appears. Assuming without deciding that the trial court erred in admitting the video excerpts, we conclude the error was harmless. Accordingly, we will affirm the judgment in case number E083174/D086603.

While defendant's appeal from the judgment was pending, he filed in the trial court a petition for resentencing under section 1172.6. The trial court denied the petition without prejudice. Defendant appealed that order, which was consolidated with the appeal from the underlying judgment. Defendant requests in his reply brief that if we affirm the judgment, that we dismiss his appeal without prejudice to allowing him to seek relief in the trial court again under section 1172.6. We grant this request and will therefore

---

[1] Statutory references are to the Penal Code unless otherwise indicated.

2

dismiss the appeal from the order denying section 1172.6 resentencing in case number E083704/D086604.[2]

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background

#### 1.  Prosecution Evidence

On the evening of June 12, 2018, defendant and four other people were driving around Perris in a white Jeep Renegade SUV.  Darryl Turner was driving; defendant's older brother Shaunte Martin was in the front passenger seat; defendant was in the rear driver-side seat; Natalie B. was in the rear middle seat; and defendant's younger brother Isaiah M.[3] was in the rear passenger-side seat.

All five Jeep occupants were members of a group that used the names HOE gang, Hooliganz, and HGO (which stands for HOE Gang Official or Hooliganz Going Off).[4]  Defendant was a founding member of HGO, which began in 2015 as a rap music label with about 15 members.  At the time of defendant's trial in 2021, HGO had 30 to 40 members.  A gang expert testified — and the defense disputed — that HGO became a criminal street gang after its predominantly African-American members frequently got into

---

[2]    We express no opinion on how the trial court should rule on a renewed section 1172.6 petition.

[3]    Isaiah has a different last name than defendant.  Because defendant and Shaunte have the same surname, and because Isaiah was a minor at the time of the offense, we will refer to defendant's brothers by their first names.

[4]    At trial, the parties used these names interchangeably.  For consistency, we will refer to the group as HGO except when context dictates otherwise.

3

schoolyard fights with members of Perres Maravilla, or PMV, a predominantly Hispanic criminal street gang based in Perris and associated with the Mexican Mafia.[5] HGO members committed robberies, assaults, attempted murders, and murders. HGO used a common hand sign representing the letter "H," and defendant had a tattoo on his midsection of the letters "HG," which the expert believed stood for "HOE gang."

Defendant was also a member of the Edgemont Criminals, a criminal street gang based in Moreno Valley, which neighbors Perris to the north. Edgemont Criminals wear attire displaying the letter "A" because the gang claims territory on Adrienne Avenue in Moreno Valley. Edgemont Criminals and HGO had a "very good, strong" relationship — all of HGO's founding members were also Edgemont Criminals and it was common to be members of both.

As the Jeep drove around on June 12, 2018, defendant and Isaiah were "a little paranoid" and "mad" because Isaiah had recently been chased by cars full of PMV members. Defendant's group encountered a young Hispanic male, Jose A. Turner slowed the Jeep, defendant stuck his head and body out the rear driver-side window, and Isaiah "hit up" Jose by asking him "what's up" and then "cussing [him] out." Someone in the Jeep recognized Jose as the brother of a friend, so defendant's group left him alone and drove off.

At the nearby intersection of Fifth Street and Perris Boulevard, the Jeep approached three Hispanic male teens on their way home from buying drinks at a market. Fifteen-year-old Bryan C. was on a bike with his dog attached by a leash; Juan C. was on a scooter; and Alfred M. was on foot. Bryan was wearing a Pittsburgh Pirates baseball cap with the letter "P" on it.

---

[5]     HGO and PMV remained rivals and frequently engaged in graffiti, or "tagging," derogatory to one another.

Bryan knew the hat was associated with the PMV gang but "didn't think anything was wrong with that." Bryan was not a PMV member.

From the Jeep, Isaiah angrily called out to Bryan, who recognized Isaiah from school. Bryan whispered to his friends to ignore Isaiah and keep going. After Bryan's group went past the Jeep, defendant and Isaiah got out of the Jeep and Isaiah yelled, " 'F[**]k PMV,' " and fired three shots from about five to seven feet behind Bryan. Bryan was struck in the back and buttocks and fell off his bike. Bryan looked back and saw two African-American males with bandanas covering their faces standing outside the Jeep. Bryan identified the shooter as Isaiah and the other male as the one who had been sitting directly behind the driver.

Bryan's companion Juan heard bullets fly by him and ran to hide behind a tree. From there, he recognized Isaiah as the shooter and looked him "dead in the eyes when he was shooting." Isaiah had a black bandana wrapped around his gun. Juan saw that the other male outside the Jeep, who he recognized as one of Isaiah's brothers, was holding a gun but was not shooting. Juan did not know the other Jeep occupants by name but recognized them as "rappers on the internet" from HGO. Juan ran to Bryan's house and told Bryan's parents what happened.

Isaiah and defendant got back in the Jeep and fled. Police and medical personnel responded to the scene. Police found three shell casings that were all fired from the same gun. Bryan was taken to the hospital and underwent emergency surgery. One of the bullets hit his spinal cord, paralyzing him from the waist down.

5

As part of a plea deal, Turner (the Jeep's driver) testified for the prosecution.[6]  He told jurors that defendant and Isaiah both got out of the Jeep just before the shooting, but Turner did not know which of them fired a gun.  Turner told police that, on one hand, the shooter could have been defendant because Turner later saw him in the Jeep holding a black rag or bandana in his hands as if he were concealing something in it.  On the other hand, the shooter could have been Isaiah because Isaiah got out of the Jeep first.  Turner never saw a gun in the Jeep and did not know there was one in it.

Turner further testified that after defendant and Isaiah got back in the Jeep, defendant told Turner to drive "to a place in Edgemont . . . because he had to talk to his homies."  During that drive, defendant told the other Jeep occupants, " 'Y'all better not say nothing.' "  Defendant later warned people to " 'be careful' " and that " 'Mexicans are going to be out so watch your back.' "

Turner also explained to the jury that he, defendant, and Isaiah are members of HGO.  He surmised that "PMV has a problem with HGO because [PMV members] don't understand that [HGO members] are just a music group" and not a criminal street gang.  Turner conceded, however, that he stated in his plea agreement that HGO *is* a gang.

Riverside County Sheriff's Sergeant Christopher Varela testified as an expert on gangs.  He explained concepts regarding gang formation, membership, signs, monikers, territory, and reputation.  He also described the concept of "hunting," in which members of one gang "go on a mission to find . . . members of a rival street gang" by traveling "to an area where they are expected to find" them "in hopes to find them and have some kind of

---

[6]    Turner pled guilty to attempted murder and admitted a gang enhancement identifying HGO as the gang.

confrontation." The confrontation can range from verbal to violent — including "shooting with intent to kill." Sergeant Varela testified that the area where the shooting occurred has been claimed by PMV "since the inception of that criminal street gang" and "absolutely" would "be a good place to start" if one "were to go looking for some PMV gang members."

Sergeant Varela also discussed the formation and history of HGO (described above). He opined that defendant and Isaiah are both members of HGO.

When asked a hypothetical question that mirrored the facts surrounding the shooting in this case, Sergeant Varela testified it was his opinion that the shooting was gang-related. Even as to a participant who got out of the car but did not shoot, Sergeant Varela explained that doing so encourages the shooter by "helping with . . . morale," "supply[ing] more numbers" to ensure the crime is committed, and acting as a witness who can vouch for the shooter's reputation.

Sergeant Varela testified that, to garner respect, gangs tag their territory with graffiti and engage in "cyber ganging" by posting images on social media sites. The prosecution introduced three excerpts from a rap music video posted by HGO to YouTube about two months after the shooting. We discuss this video in greater detail in part III.A.1, *post*. In short, Sergeant Varela testified that the video featured three rappers — including defendant — who were members of both Edgemont Criminals and HGO, and that the lyrics, attire, and hand gestures reflected simultaneous allegiance to both gangs.

About five months after the shooting, in November 2023, a sheriff's investigator interviewed defendant about the incident. Defendant denied that he or Natalie were present during the shooting. Defendant claimed he

was at the beach in San Diego with Turner at the time and did not return to Perris until after the shooting. He also denied meeting with fellow gang members in Edgemont Criminals territory after the shooting.

An FBI special agent testified that cellphone records placed defendant and Shaunte near the crime scene on the evening of the shooting. Records also showed a gap in call activity surrounding the 7:50 p.m. shooting — from about 6:36 p.m. until about 8:34 p.m., when defendant's phone was active near his grandmother's residence in Edgemont Criminals territory.

Just after speaking with investigators, defendant called Natalie. Investigators recorded the call, and portions were played at trial. At the beginning of the call, defendant expressed consciousness of guilt by stating, "I'ma have to be doin' life in this motherf[****]r." Defendant told Natalie to fabricate a story about what happened.

In addition to Turner's plea deal, the jury learned that Shaunte also pled guilty to conspiracy to commit attempted murder and to active participation in a criminal street gang, with HGO identified as the gang.[7]

### 2. Defense Evidence

Defendant testified in his own defense. Regarding formation of HGO, defendant stated he and friends formed it in 2016 when he was in high school. Isaiah was still in middle school and did not join until the next year; he was not a member of any gang. HGO's "main goal" was to become a major record label that signed artists and produced rap videos. HGO had about 16 members, produced about 15 rap videos, and each of its rappers had about 20 songs posted online. The group started as "HOE gang" but

---

[7] Although the jury did not learn of it, Isaiah also pled guilty to attempted murder.

changed its name to HGO after the label's first song became popular and fans questioned the original name. Defendant acknowledged HGO used a hand sign for the letter "H," but he denied it was a criminal street gang. Defendant claimed HGO disbanded after Shaunte admitted as part of his plea deal that HGO was a gang.

Defendant admitted he was a member of Edgemont Criminals, explaining he joined when he lived with his grandmother for a while in that gang's territory. Edgemont Criminals did not have problems with HGO. Defendant claimed HGO did not have problems with PMV, but PMV had problems with Isaiah, in particular, because Isaiah and his teenage friends would often "get into it" with younger siblings of PMV members.

Regarding the shooting, defendant admitted that he lied (and that he asked Natalie to lie) to investigators about him not being there. He explained he lied because cooperating with the police would be detrimental to his rap career and his membership in Edgemont Criminals. When asked at trial how his relationship with Natalie was "now," defendant said he had not "talked to her in like three months." When confronted, however, he admitted he had spoken to her over the weekend — "in other words, a couple days ago" — and told her he wanted to marry her and that "she should grab paperwork from . . . city hall so that [they] can get married." Defendant also admitted he had a prior felony conviction for possession of a firearm with a gang enhancement identifying Edgemont Criminals.

Defendant testified about what happened the day of the shooting. He was riding in Turner's Jeep with Turner, Shaunte, and Natalie, when Isaiah called and asked for a ride because he was being chased by three cars full of Hispanics. They picked up Isaiah and drove to Perris to pay a cellphone bill and buy marijuana at a dispensary. Defendant admitted he was "hang[ing]

9

out the window" of the Jeep during the encounter involving Jose. The group moved on when someone recognized Jose as an acquaintance.

When later, they came upon Bryan and his friends, defendant was looking at his phone and did not see them until Shaunte said something about wanting to fight them. It appeared to defendant that Shaunte was getting out of the car, so defendant did too — their father taught them, "If [your] brother fights, you fight with your brother." Defendant said he did not have any weapons with him. Defendant initially saw someone on a bike and someone on a scooter, and then a third person materialized. As defendant got to the rear of the Jeep, he heard a gunshot. He thought the third person was shooting at defendant's group, so defendant ducked and headed back toward the Jeep. He heard two more gunshots in quick succession. Defendant got in the Jeep and told Turner to drive. Defendant never saw whether Shaunte or Isaiah ever got out of the Jeep. Nor did he hear anyone "say anything about PMV or yell f[**]k" — the actual statement was, " 'What you n[****]s want to do?' " Defendant told Turner to drive to Edgemont Criminals territory in Moreno Valley because he believed he had been shot at and "when you get shot at, most of the time you're supposed to go report it to your homies."

## B. Procedural Background

As relevant here, prosecutors charged defendant with attempted murder (§§ 664, 187, subd. (a)) of Bryan and Juan, and active participation in a criminal street gang (§ 186.22, subd. (a)) as to HGO.[8] The attempted murder counts included gang (§ 186.22, subd. (b)(1)(C)) and firearm (§ 12022.53, subds. (d), (e)) enhancement allegations. The prosecution

---

[8] The prosecution also initially charged defendant with being a felon in possession of a firearm (§ 29800, subd. (a)(1)) and felony vandalism/graffiti (§ 594, subd. (a)), but dismissed those charges before trial.

further alleged that defendant had a prior conviction for carrying a loaded firearm (§ 25850, subd. (c)(6)) with a gang enhancement (§ 186.22, subd. (b)), which was both a serious prior and a strike prior.

The jury found defendant guilty of the attempted murder of Bryan and found that the attempt was willful, deliberate, and premeditated. The jury found the firearm and gang enhancement allegations attached to this count to be not true. The jury found defendant not guilty of the attempted murder of Juan and the offense of active participation in a criminal street gang. Defendant waived trial on the prior conviction and admitted it.

The trial court sentenced defendant to 14 years to life (seven years to life, doubled for the strike prior).

On February 2, 2024, defendant filed a notice of appeal, which the court deemed timely.

On March 25, 2024, defendant filed in the trial court a petition for resentencing under section 1172.6.

On April 12, 2024, the trial court denied the petition without prejudice.

On April 17, 2024, defendant filed a notice of appeal from the order denying resentencing.

On August 27, 2024, defendant filed a request to stay his appeal of the resentencing order pending the resolution of his appeal from the judgment of conviction. Division Two of this court denied defendant's request and instead consolidated the appeals for purposes of briefing, oral argument, and decision. The court further directed that defendant's opening brief "should include any issues from both appeals, including whether the trial court had jurisdiction to grant the . . . section 1172.6 motion while the appeal of the underlying conviction was pending."

11

## III.  DISCUSSION

### A.  Any Error in Admitting Excerpts from the Rap Video Was Harmless

Defendant contends the trial court erred in admitting excerpts from the rap video because any probative value was substantially outweighed by the risk of undue prejudice.  (Evid. Code, § 352.)[9]  Assuming without deciding that the trial court erred in admitting the video excerpts, we find the assumed error harmless.

#### 1.  Background

##### a.  Motion in Limine

Before trial, the prosecution moved in limine to show the jury two entire rap videos.  The first video, two minutes and 49 seconds long, was called "Geekin'."  The second video, three minutes and 21 seconds long, was called "Man Down May Day."

---

[9]  Defendant also argues that the trial court's admission of the video excerpts violated Evidence Code section 352.2, which identifies factors in addition to those identified in Evidence Code section 352 that trial courts must consider when "a party seeks to admit as evidence a form of creative expression."  (Evid. Code, § 352.2.)  Although Evidence Code section 352.2 took effect after defendant's trial, he maintains the statute applies retroactively to his case because his judgment is not yet final.  While this appeal was pending, however, the California Supreme Court held that Evidence Code section 352.2 does not apply retroactively to trials — like defendant's — conducted before the statute's effective date.  (*People v. Aguirre* (2025) 18 Cal.5th 629, 688, 690 (*Aguirre*).)  Defendant acknowledged during oral argument that *Aguirre* clarified Evidence Code section 352.2 was not retroactive as he argued in his briefing.

The prosecutor's written motion in limine addressed only *Geekin'*. The motion argued the entire video was admissible because (1) "HGO . . . is a relatively new criminal street gang," so "there is much less gang evidence . . . than what might be available in a more extensively documented gang"; (2) the video "is highly probative of the gang allegation" because it depicts defendant with two other Edgemont Criminals members, which shows both that "some Edgemont Criminals [are] also HOE members" and that defendant is "affiliat[ed] with a more heavily documented street gang with a deep history of criminal conduct"; and (3) defendant's affiliation with Edgemont Criminals members "corroborates . . . Turner's story that immediately after the shooting, the group fled to the Edgemont neighborhood."

At the outset of the motion in limine hearing, the court advised that it watched the videos and had given the prosecutor a tentative ruling "that it's probably not all going to come in." In response, the prosecutor withdrew his request to admit the second video and proposed to admit only three excerpts from *Geekin'* totaling about 58 seconds. The prosecutor argued the excerpts would feature lyrics and symbols showing the connection between the Edgemont Criminals and HGO. The prosecutor added that the exhibit "would go strictly to the gang" enhancement allegation and substantive offense. The prosecutor further argued that the timing of the video — posted online about two months after the shooting in this case — was "a celebration" of the shooting and a statement that Edgemont Criminals and HGO "together . . . are a force to be reckoned with."

Defense counsel objected under Evidence Code section 352 that the excerpts lacked probative value because, although defendant is seen in the

13

video displaying hand signs, he did not perform the lyrics and the prosecution may have "misread some of the important hand signs."

The trial court granted the prosecutor's motion, finding the excerpts — which were "very limited in comparison to what [the prosecutor] wanted at the very beginning" — to be probative, "not too remote . . . in time to the incident," and not "too prejudicial."

### b. Trial

On the first day evidence was presented at trial, the prosecution played the rap video excerpts for the jury and had Sergeant Varela explain certain lyrics and imagery. A transcript of the video was provided to the jury and reads in its entirety as follows:

[Excerpt No. 1.]

Kishaun [Southall]: It's DaHooliganz n[***]a. Yeah, alright.

[Background Vocals]

[Excerpt No. 2.]

Donovan [Harris]: Your face is where me bust down Tatiana. B[****], I'll put that in your face and *I'll put that on my momma HGO, 'bout the drama* RIP, stacking commas. And we all in this b[***]h. We just trying to get rich, washing rims and my jeans are plain Jane and my wrist. Heavy heart killed my brother. So, I had to flip the script. Went from thinkin' like the drugs to playing ball like the crypt. This is back from the chicken like I went to Chick-Fil-A and my b[***]h smoke gas talkin' 54A. All these bands in my pants making a n[***]a gain weight. *If you don't bang the A, hit that n[***]a with the K.*

14

[Excerpt No. 3]

Unidentified:  HGO the gang.  HGO the gang though [inaudible].

[Defendant]:  [Inaudible].  (Italics added.)

Sergeant Varela testified the first excerpt — "It's DaHooliganz, n[***]a" — was significant for two reasons.  First, "The Hooliganz is one of the names that HGO . . . goes by, so that's them saying who is doing this video."  Second, this lyric is performed by Kishaun Southall, who is both a founding member of HGO and an Edgemont Criminals member.

Turning to the second excerpt depicted in the longer paragraph block-quoted above, Sergeant Varela addressed only the two passages we italicized above.  Regarding the lyrics "I'll put that on my momma HGO, 'bout the drama," Sergeant Varela explained that "when someone says that they put that on their momma[,] . . . they're placing the validity of that on their mom, their family."  In this context, the significance of the lyric suggests that the speaker "is saying, 'Believe me when I say that HGO is about drama,' " which "can mean a lot of things."  Sergeant Varela also found it significant that this excerpt was performed by Donavan Harris, who is also a member of both HGO and Edgemont Criminals.

Regarding the lyrics, "If you don't bang the A hit that n[***]a with the K," Sergeant Varela explained that the letter "A" represents Edgemont Criminals, and the letter "K" can mean either to "commit some kind of act of

15

violence upon [a] person" (e.g., to "*k*ill" them) or it can mean "to walk away or something to that effect."[10]

The prosecution introduced screenshot photos from the second video excerpt. The photos generally showed defendant making hand signs for both HGO (the letter "H") and Edgemont Criminals (the letter "E" or "A"),[11] and Southall and Harris making HGO hand signs while wearing attire representing Edgemont Criminals. Sergeant Varela opined this was significant because it showed allegiance to both gangs.

The third rap video excerpt shows defendant and others shouting "HGO the gang" while acting disruptively in a public restaurant. Sergeant Varela explained that gang members shouting their gang's name while committing a crime or "just being a disturbance" is a way "to increase the reputation for . . . fear."

More broadly, Sergeant Varela explained that rap videos are a way for gangs to "get[] their name out there to a wider band of people" and "let[] people know what this particular group is about." The *Geekin'* video was uploaded to YouTube on August 16, 2018, about two months after the shooting.

In closing argument, the prosecutor characterized the charged offenses as "defendant and his music label . . . hunting" and finding "a 15-year-old boy . . . simply walking on the street" with his friends. Regarding the rap

10    On cross-examination, Sergeant Varela acknowledged that the first possible meaning — that "if you're not banging with us, we're killing everybody" — "doesn't really make sense in the big scheme of things." He explained, "It's a stretch on their end" but "it's how they speak, I guess."

11    The defense contended defendant was displaying a "G" sign, which Sergeant Varela believed would stand for the "G" in HGO. Defendant testified it stood for the "G" in Hooliganz.

16

video, the prosecutor argued that it was posted "just two months after the defendant and his music label hunted down Bryan." The prosecutor characterized the video as "a celebration" by HGO saying, "We're here, this is who we are." The prosecutor argued more generally that the video established HGO's status as a criminal street gang, defendant's allegiance to HGO, and HGO's willingness to use violence to defend the gang and its territory.

### B. Relevant Legal Principles

" 'Gang evidence is admissible if it is logically relevant to some material issue in the case other than character evidence, is not more prejudicial than probative, and is not cumulative.' " (*People v. Coneal* (2019) 41 Cal.App.5th 951, 964 (*Coneal*); see *People v. Hin* (2025) 17 Cal.5th 401, 476 (*Hin*).) Because gang evidence " 'may have a highly inflammatory impact on the jury[,] . . . "trial courts should carefully scrutinize such evidence before admitting it." ' " (*Coneal*, at p. 964; see *Hin*, at p. 476.)

Under Evidence Code section 352, a trial court may exclude otherwise admissible evidence if the court, "in its discretion," determines that the evidence's "probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice." (Evid. Code, § 352; see *Hin*, *supra*, 17 Cal.5th at p. 476.) " 'A trial court's admission of evidence, including gang testimony, is reviewed for abuse of discretion.' " (*Coneal*, *supra*, 41 Cal.App.5th at p. 964; see *Hin*, at p. 476.)

A trial court's erroneous admission of evidence warrants reversal of the judgment only when "there [is] a reasonable probability of a different outcome . . . absent the error" (*Hin*, *supra*, 17 Cal.5th at p. 482, citing *People v. Watson* (1956) 46 Cal.2d 818, 836) or when "the error . . . constitute[d] a

due process violation that rendered [the] trial fundamentally unfair" (*Hin*, at p. 482; see *Coneal*, *supra*, 41 Cal.App.5th at p. 972).

## C. Analysis

Assuming without deciding that the trial court erred under Evidence Code section 352 in admitting excerpts from the *Geekin'* rap video, we conclude the error was harmless and did not render the trial fundamentally unfair.

The evidence supporting defendant's attempted murder conviction is overwhelming. On the day of the shooting, defendant was mad because carloads of PMV members chased his younger brother. Consistent with Sergeant Varela's expert opinion regarding the gang practice of "hunting," defendant and a carload of fellow HGO members drove through PMV territory "hitting up" Hispanic males.[12] Defendant actively participated in the engagement by hanging his body out the window while his group confronted the first Hispanic male they encountered. When that male turned out to be an acquaintance, defendant's group moved on and confronted Bryan, another Hispanic male wearing a hat associated with PMV. Three eyewitnesses (Bryan, Juan, and Turner) identified Isaiah as the first Jeep occupant to exit and confront Bryan's group. Defendant admitted at trial that he was in the Jeep and that he proactively exited to support Isaiah because their father taught them that "if [your] brother fights, you fight with your brother." Sergeant Varela explained in connection with a hypothetical question that a non-shooter exiting a vehicle alongside a shooter supports and encourages the shooter. Bryan and Juan identified Isaiah as the shooter;

---

[12] Regardless of whether HGO was a criminal street gang, defendant acknowledged that PMV had issues with Isaiah, in particular, and photos showed defendant and Turner being disrespectful of PMV's anti-HGO graffiti.

Bryan said Isaiah's gun was wrapped in a black rag; and Juan reported that defendant was holding a gun, too, but did not fire it.

After the shooting, defendant directed Turner to drive to Edgemont Criminals territory so that defendant could "report [the shooting] to [his] homies." Cellphone records and Turner's testimony corroborate this travel. During the drive, Turner saw defendant holding a black rag or bandana in a manner consistent with concealing something. Defendant claimed at trial that he happened to find a black rag in Turner's Jeep during the drive. Defendant warned the Jeep occupants during the drive that " 'y'all better not say nothing,' " and he later warned others to " 'be careful' " and that " 'Mexicans are going to be out so watch your back.' "

When first interviewed by law enforcement, defendant admittedly lied and told them he was in San Diego at the time of the shooting. Defendant also admitted at trial that he encouraged Natalie to fabricate an alibi for him and he was impeached about his continued contacts with her. Defendant was further impeached with a prior felony conviction.

The prosecution also introduced through Sergeant Varela extensive expert testimony regarding gang culture. This included concepts regarding gang formation, membership, signs, monikers, territory, reputation, and hunting. He also answered hypothetical questions based on the evidence presented during the case. Notably, the hypothetical questions did not reference the rap video excerpts.

Against this backdrop, it is not reasonably probable that defendant would have obtained a more favorable outcome at trial had the trial court excluded the rap video excerpts. To begin, the rap video evidence was very limited — the video clip is less than one minute long and the transcript is

less than one page. Additionally, the prosecutor asked Sergeant Varela about only a few lines of lyrics.

Substantively, those lyrics were not particularly inflammatory. They did not "casually describe graphic, widespread violence." (*Coneal*, supra, 41 Cal.App.5th at p. 970; cf. *Hin*, *supra*, 17 Cal.5th at p. 480 [noting the "undue prejudicial effect" of lyrics that "are graphic and violent, repeatedly describing 'blast[ing],' 'killing,' [and] 'murder[ing]' " rivals].) The first and third excerpts included only references to "DaHooliganz" and "HGO the gang." And the second excerpt included only a vague reference to "drama" and an ambiguous reference to "hit[ting] that n[***]a with the K," which Sergeant Varela explained could be a reference either to violence *or* to simply ignoring people who are not Edgemont Criminals members. Indeed, he acknowledged on cross-examination that the violent interpretation makes less sense than the innocuous one. The video's vague allusions to violence were "certainly no more disturbing than the facts of the . . . attempted murder[] charged in this case" (*Aguirre*, *supra*, 18 Cal.5th at p. 697), which involved shooting a teenage boy in the back and paralyzing him.

Nor were the cited lyrics otherwise particularly inflammatory. Although the excerpts included three instances of the word "n[***]a," the prosecutor did not highlight the term or otherwise suggest the African-American rappers used them in a racially pejorative sense. (See *Aguirre*, *supra*, 18 Cal.5th at p. 697 ["The prosecutor on multiple occasions attempted to clarify that defendant used the recurring slur found in the lyrics and instant messages to refer to friends and enemies generally, not a particular racial group"], citing *People v. Townsel* (2016) 63 Cal.4th 25, 67 [noting that "the prosecutor, in his closing argument, made no effort to portray defendant as a racist"]; cf. *Hin*, *supra*, 17 Cal.5th at p. 480 ["The exchange between the

20

prosecutor and [a detective] over the lyrics' inclusion of the word 'n***a' appeared designed to evoke anti-Black biases"].)

Similarly, although the excerpts included the word "b[***]h" three times, defendant does not complain that the lyrics were overtly sexual or misogynistic. (Cf. *Coneal*, *supra*, 41 Cal.App.5th at pp. 970, 971 [finding that "rap videos . . . contain[ed] misogynistic lyrics" that "had no probative value yet were highly inflammatory"]; *Hin*, *supra*, 17 Cal.5th at p. 480 [noting the potentially "undue prejudicial effect" of lyrics that "include inflammatory and irrelevant descriptions of sexualized violence"].)

Finally, we infer from the fact that the jury found in defendant's favor on the gang enhancement allegation, the substantive gang offense charge, and the attempted murder charge as to Juan that the jury's passions were not inflamed by the prosecution's gang evidence. We can find no principled basis on which the jury could have found that the rap video excerpts were inflammatory only as to the attempted murder of Bryan and *not* inflammatory as to the remaining charges and allegations — particularly those regarding gangs.

Defendant maintains the rap video excerpts were prejudicial and rendered his trial unfair because "the prosecutor referred to [defendant]'s 'music label' twenty-six times during closing and rebuttal arguments, referenced the video nine times, and described [defendant] as being on a 'hunting mission' or a 'mission to hunt people down' nine times." We are not persuaded. The prosecutor's references to defendant's music label were obviously in response to the defense theme that HGO was not a criminal street gang, but rather, a legitimate music label. In that context, admitting the video excerpts, which are of high production quality, conceivably *supported* defendant's theory.

Defendant's reliance on the prosecutor's references to "hunting" is similarly unavailing. The rap video excerpts do not use the word "hunting" or otherwise discuss or describe the concept. Indeed, during trial, the rap video was introduced through Sergeant Varela on the first day of evidence and he did not discuss the concept of hunting until he was recalled several days later.

To the extent the prosecutor referenced the video during closing arguments, defendant does not address specifically how those references were prejudicial. As discussed above, we conclude they were not.

For these reasons, we conclude that even assuming the trial court erred by admitting the rap video excerpts, the assumed error was neither prejudicial nor deprived defendant of a fundamentally fair trial.

## D. We Grant Defendant's Conditional Request to Dismiss Without Prejudice His Appeal from the Order Denying Resentencing

As noted, Division Two of this court denied defendant's request to stay the appeal from the order denying resentencing. Instead, the court consolidated the resentencing appeal (case No. E083704/D086604) with defendant's appeal from the underlying judgment (case No. E083174/D086603) and directed that defendant's opening brief "include any issues from both appeals, including whether the trial court had jurisdiction to grant the . . . section 1172.6 motion while the appeal of the underlying conviction was pending."

Defendant's opening brief on appeal does not address the jurisdiction question or the merits of defendant's appeal from the resentencing order. (See § 1172.6, subd. (g) ["[a] person convicted of . . . attempted murder . . . whose conviction is not final may challenge on direct appeal the validity of

22

that conviction"].)  Instead, defendant asserts that his appeal from the resentencing order "may not be ripe, because the [underlying] conviction . . . may be reversed on appeal."  Alternatively, defendant asserts that if the judgment is affirmed, he "will at minimum be entitled to file a brief under *People v. Delgadillo* (2022) 14 Cal.5th 216 [(*Delgadillo*)]," which specifies a procedure for appeals from postjudgment orders on section 1172.6 resentencing petitions.

The People argue in their respondent's brief that (1) the trial court lacked jurisdiction to entertain the section 1172.6 petition while defendant's appeal from the judgment was pending and that we should therefore dismiss the resentencing order appeal (see, e.g., *People v. Wagner* (2009) 45 Cal.4th 1039, 1061 [stating the general rule that " ' "[t]he filing of a valid notice of appeal vests jurisdiction of the cause in the appellate court until determination of the appeal and issuance of the remittitur" [citation] and deprives the trial court of jurisdiction to make any order affecting the judgment' "]; *People v. McKenzie* (2020) 9 Cal.5th 40, 46 ["In criminal actions, the terms 'judgment' and ' "sentence" ' are generally considered 'synonymous' "]); (2) defendant's appeal from the resentencing order fails on the merits because he does not fall within the scope of section 1172.6 in that he was not "[a] person convicted of . . . attempted murder *under the natural and probable consequences doctrine*" (§ 1172.6, subd. (a), italics added); and (3) the *Delgadillo* process does not apply because defendant's nonfinal judgment is still on direct appeal (see *Delgadillo*, *supra*, 14 Cal.5th at pp. 231–232).

In reply, defendant requests, "in the interests of justice, . . . that if the conviction is affirmed, the appeal of the [order denying resentencing under section] 1176.2 should be dismissed without prejudice, with the proviso that

[defendant] may file a new petition for resentencing under section 1172.6 in the superior court," "just as the trial court's dismissal of his petition was without prejudice."

Because we are affirming defendant's conviction, and are therefore satisfying the condition precedent to defendant's conditional request to dismiss his appeal from the order denying resentencing under section 1172.6, we agree it is in the interests of justice to grant his request.

## IV.  DISPOSITION

The appeal in case number E083704/D086604 is dismissed, without prejudice to defendant pursuing further relief under section 1172.6 in the trial court.  The judgment at issue in case number E083174/D086603 is affirmed.

RUBIN, J.

WE CONCUR:

DO, Acting P. J.

CASTILLO, J.